[No. B114354. Second Dist., Div. Four. Oct. 28, 1998.]

MICHAEL JACKSON, Plaintiff and Appellant, v.
PARAMOUNT PICTURES CORPORATION et al., Defendants and
Respondents.

## Counsel

Katten, Muchin & Zavis, Zia F. Modabber and Steve Cochran for Plaintiff and Appellant.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser and Ronald E. Guttman for Defendants and Respondents.

## Opinion

**CURRY, J.**—Appellant Michael Jackson brought suit against respondents Paramount Pictures Corporation, Diane Dimond, and Stephen Doran, alleging that he had been slandered by reports broadcast on the television program *Hard Copy*[1] and in a radio interview with Dimond. During these broadcasts, the search for and purported existence of a videotape showing appellant inappropriately touching an underage boy in a sexual manner were discussed. The trial court granted summary judgment to respondents based on the truth of the statements made in the broadcasts and the lack of evidence of malice. After review of the record and the evidence in support of and in opposition to the summary judgment motion, we affirm the trial court's ruling.

### Factual and Procedural Background

*The KABC-AM Radio Broadcast*

Two over-the-air reports dealt with the alleged videotape. The first occurred on January 9, 1995, on the *The Ken and Barkley Show* broadcast by

---

[1]Respondent Paramount Pictures Corporation produces *Hard Copy*. Respondents Dimond and Doran are reporters on the show.

KABC-AM radio.[2] Respondent Diane Dimond appeared as a guest on the program. To keep the statements made in their proper context, we repeat the entire text of the interview as it related to appellant rather than rely on excerpts:[3]

Q: "You are going to give us the first scoop on Michael Jackson of 1995."

Dimond: "You know, . . . just when you think the story is going away, it's not. It . . . the investigation is red hot again and here is the deal. The District Attorneys' Office, the top investigators within the District Attorneys' Office are looking for a 27 minute video tape that they believe shows Michael Jackson and a young boy."

Q: "This is a recent video, or something[.]"

Dimond: "Yes. . . . It was taken right before Christmas as the story goes and it was recorded by one of Michael Jackson's own security cameras. He likes, everybody knows that he likes to bug rooms and put cameras up and the whole 9 yards[.]"

Q: "How do they know about this?"

Dimond: "Well, it's kind of a convoluted story but the bottom line as I understand it is: someone close to . . . Michael Jackson knew of the existence of this tape. It is an x-rated tape, I must tell you and [—]"

Q: "It is an x-rated tape?"

Dimond: "It is . . . yes."

Q: "Of Michael Jackson[?]"

Dimond: "Truly explicit."

Q: "It's what? Michael Jackson and little boy. Are you 100% sure that this tape exists?"

Dimond: "I am as sure as I can possibly be."

---

[2]KABC-AM's owner, KABC-AM Radio, Inc., and the former hosts of its morning program, Ken Minyard and Roger Barkley, were also named as defendants by appellant and dismissed on summary judgment by the trial court. Appellant abandoned his appeal from the judgment entered in their favor.

[3]There is no "official" transcript, but virtually identical written transcripts of the audio recording of the broadcast were prepared by the parties and presented to the trial court. We have deleted only the speakers' stammers and repetitions.

Q: "You have not seen it?"

Dimond: "I have not seen it but one of my best sources on the Michael Jackson story has seen it."

Q: "Who . . . you have no doubts about."

Dimond: "I have never had a doubt about this person, ever. I know the District Attorneys' Office is looking for it because they are calling up reporters saying 'Have you seen it.' . . . Do you know where we can get it?"

Q: "Who had it and was showing it? His security people?"

Dimond: "Well, someone close to Michael Jackson found this tape and, in deep concern for the boy involved, gave it to the boy's mother."

Q: "Uh oh. Should Michael not know that one of his own security cameras was recording what he was doing?"

Dimond: "Oh no, he knew. He absolutely knew."

Q: "He is asking for trouble. [Inaudible.]"

Dimond: "You know, I remember way back when, more than a year ago, we interviewed the head of the pedo[ph]ile unit at the FBI in Quantico, Virginia and he said you know the down fall of pedo[ph]iles is that they love to keep a momento of their victims. Or, they love to take pictures or take videos. We don't know why, but they do this. It is for their own self gratification later but it always comes back to bite them."

Q: ". . . It looks to me. I think old Mike had better get his checkbook out again. . . . That's the way this is going to end up."

Dimond: "I got to tell you, Ken, is what the DA's office is worried about. There is like a mad scramble to get to this tape before the Jackson camp gets to this tape."

Q: "Here is what happened. . . . If that tape . . . does exist as you say."

Dimond: "Right."

Q: "Somebody close to Michael Jackson got a hold of it and thought holy, baloney this is worth a lot of money. Look, I'll split it 50/50 with you and we can get maybe $50 million."

Dimond: "That could very well be."

Q: "And he gave it to the mother of the boy?"

Dimond: "Correct."

Q: "So she has it."

Dimond: "And, I have to tell you, if my source is correct, who has seen this tape, and again, he always has been. The acts that are being performed on that tape are exactly what the accuser a year ago said Michael Jackson did to him."

Q: "Well, I mean you don't need to beat around the bush. What are those acts?"

Dimond: "We are talking about oral sex."

Q: "Um, hmm. Performed on Michael Jackson or by Michael Jackson?"

Dimond: "By Michael Jackson. . . . So, . . . You know, it is going to unfold this week. I am trying to confirm right now, we understand that there might . . . have been copies made of this tape."

Q: "I bet there was."

Dimond: "And you know, if . . . the Jackson camp gets it, or if it is somehow hushed up or bought off or whatever. I understand there might be a copy of it."

Q: "Now, wait a minute. After all that happened during 1994 with Michael Jackson. What was a parent letting their kid do with Michael Jackson in his house."

Dimond: "Bingo."

Q: "Is this up in Santa Barbara?"

Dimond: "No, it was here in Los Angeles."

Q: "In LA, so it's our own District Attorney."

Dimond: "And, I got to tell you, I know, I know many of the investigators within the District Attorneys' Office. They got the top guys on this. They are

not beating around the bush. I got to tell you too, this mother, when she got this tape, made an initial contact to the LAPD Sexual Exploitation Unit and they told her unbelievably. Well, okay, you say you have the tape, just take it to any local precinct and turn it in. And she said to herself. This is not the kind of protection I need, thank you very much, forget it."

Q: "Well, . . . so why didn't she?"

Dimond: "Because she is afraid. This is a very powerful man you are talking about. This is a man who has a lot of money to spread around, who can make your life very miserable. He can make [—]"

Q: "Well, but if you got [—]"

Dimond: "He can make it wonderful and very miserable."

Q: "It looks to me that if you got him on tape doing it, he is going to have a pretty hard time."

Dimond: "One of the DA's investigators was quoted as saying, 'if we get this tape and . . . if it shows what we think it shows, we put the handcuffs on Michael Jackson.' "

Q: "Well, Diane. You have to keep us informed on this. I know that Hard Copy will have it on tonight."

Dimond: "And, listen, if anybody calls you with this tape, let me know."

Q: "I will let you know."

Dimond: "I will let you know."

Later on in the broadcast, they briefly returned to the story:

Q: "Going back to the Michael Jackson video."

Dimond: "Yeah."

Q: "How did you[r] friend see it? Who showed it to your friend[?]"

Dimond: "Oh, I just can't tell you that. That would go [—]"

Q: "The mother?"

Dimond: [inaudible]

Q: "Well, it had to be either the mother of the boy or [inaudible]."

Q: "Or the security person who gave the tape."

Dimond: "You guys always have the most insightful questions. I think I better hang up right now."

That concluded *The Ken and Barkley Show* interview.

*The "Hard Copy" Broadcast*

Later that evening, *Hard Copy* broadcast the following report related to appellant, which again we repeat verbatim:[4]

First voice (apparently Kevin Smith): "[Unintelligible] . . . then Michael Jackson will be in handcuffs."

Second voice: "Reports that Michael and a teenage boy have been caught on tape."

Third voice (apparently Gutierrez): "[Unintelligible] . . . the tape, there is no doubt about it. It is very graphic."

Second voice: "Now, investigators are racing to find Michael's X-rated video."

Barry Nolan: "New trouble for Michael Jackson tonight. This time police investigators are searching for what they believe is an incriminating x-rated video. Diane Diamond [*sic*] reports."

Dimond: "If Michael Jackson thought the new year would bring him a new lease on life Barry, it just isn't happening that way. Hard Copy has

---

[4]The speakers on the tape include respondents Dimond and Doran; Victor Gutierrez, the "source" referred to by Dimond in the earlier broadcast; Barry Nolan, an anchorperson for *Hard Copy*; and Kevin Smith, a reporter, who was also seeking to track down the alleged videotape or obtain information about it.

After the KABC-AM broadcast and before the *Hard Copy* segment was aired, appellant's attorney, Howard Weitzman, sent a letter to Paramount Pictures, stating in part: "I learned earlier today that Diane Dimond, one of Paramount's *Hard Copy* reporters, was on KABC talk radio this morning and indicated that an untrue and defamatory story about an alleged videotape depicting Michael Jackson engaging in sexual relations with a minor was true, and that she believed such a tape existed. I understand that Ms. Dimond also made claims that the Los Angeles and/or Santa Barbara District Attorneys' offices are reopening their criminal investigation of Mr. Jackson, based on the purported existence of this videotape. Please be informed that Ms. Dimond's claims regarding the existence of such a videotape are untrue and defamatory, as are her claims regarding the reopening of any criminal investigation concerning Mr. Jackson."

learned that there is now a renewed police investigation into the entertainer's relationship with young boys. This time, authorities are hot on the trail of an explicit video tape they believe could make their case. [¶] Michael Jackson's videos have been seen around the world. But it is not his music videos authorities are interested in. Nope. Hard Copy can now reveal that investigators from the L.A. District Attorneys office have been working around the clock lately trying to find an x-rated video of the pop superstar which they believe shows him naked and fondling a young boy."

Gutierrez: "When you [Unintelligible] . . . the tape, there is no doubt about it. It is very graphic."

Kevin Smith: "If the D.A. gets a hold of the tape and it shows what it's supposed to show, then Michael Jackson will be in handcuffs."

Dimond: "The investigators are working for this woman. Assistant D.A. Lauren Weiss. She was once a key player in the Jackson child molestation investigation. Last year, police helped question witnesses brought before a secret grand jury. Now she has her investigators scrambling to find that video tape. Journalist Kevin Smith was questioned by the D.A.'s office."

Smith: "They are scared. Yes, this is yet another lead which is gonna be snapped up. And disappear mysteriously before they get their hands on it. What they are concerned of is it goes back into the Jackson camp and it will never be seen again."

Dimond: "It is impossible to independently confirm the existence of the video but several sources including some as far away as London say that this tape is black and white, 27 minutes long, and reportedly recorded by one of Jackson's own security cameras. Sources also tell Hard Copy the tape was somehow turned over to the Mother of the young boy seen on the video."

Smith: "The investigator I spoke to said this is what they've been waiting for. If they had the tape, that's all they needed to make an arrest."

Dimond: "Victor Gutierrez has reported on Michael Jackson for the last decade and has a book about to be published regarding the entertainer's relationship with various boys. Gutierrez has talked with this young boy's mother."

Gutierrez: "And now she is scared. And now, not only that, the District Attorney is trying to get these tapes and I guess through my sources[, t]hey already been in contact with the Mother. So, it's up to the Mother now to make the final decision."

Smith: "Even if the original copy damages or is destroyed or is hushed up, there has been a copy made and that is what the D.A. is going after."

Dimond: "Could there actually be such an x-rated tape. Well, late today, Jackson's lawyer, Howard Weitzman categorically denied the existence of such a video and he says to his knowledge neither the D.A. in Los Angeles or Santa Barbara has reactivated the case. We will have more on this developing story tomorrow. Barry?"

Barry Nolan: "Thanks Diane. . . ."

*The Complaint*

Appellant brought suit against Diane Dimond, Stephen Doran, KABC-AM Radio, Inc., Paramount Pictures Corporation, Roger Barkley, Ken Minyard, and Victor Gutierrez for slander. The first cause of action alleged that on the morning of January 9, 1995, Dimond appeared as a guest on *The Ken and Barkley Show* broadcast by KABC and falsely stated that there was a "renewed" and " 'red hot' " police investigation in Los Angeles County into new allegations of child molestation by appellant. As set forth in the complaint, ". . . Dimond stated that her most reliable source had seen a 27-minute black-and-white videotape of [appellant] molesting a young boy recorded by his security cameras. Dimond reported that the tape was 'x-rated,' that she believed her source, and that she was 'as sure as [she could] possibly be' that the tape existed. Dimond further stated that 'the top investigators within the District Attorney's office' are looking for the tape, which she stated was taken just before Christmas 1994, and that the tape had a date and time electronically imprinted on it."

The second cause of action alleged that "on January 9, 1995, Hard Copy, aired a piece in which Dimond stated that there was a 'renewed police investigation into [appellant's] relationship with young boys.' Dimond further stated that investigators from the L.A. District Attorney's office were working 'around the clock' looking for an 'x-rated video' of [appellant] allegedly showing him 'naked and fondling a young boy.' "

*The Motion for Summary Judgment*

Respondents Paramount Pictures, Dimond, and Doran moved for summary judgment. As to both the first and second causes of action, respondents asserted that they had not made any false statements of fact and had not acted with actual malice.

To demonstrate truth, respondents set forth the following facts, established in part through the declarations of Jack S. Gonterman, an investigator

employed by the Los Angeles County District Attorney's Office, and Thomas Sneddon, the District Attorney of Santa Barbara County. In December of 1994, the Santa Barbara County District Attorney's Office received information (1) that a videotape existed depicting appellant engaged in sexual contact with a minor, and (2) that Gutierrez, a freelance journalist who reports on appellant's activities, had seen such videotape. Gonterman had been assigned to the investigation of allegations that appellant sexually molested minor children, which investigation, according to Gonterman, "has continuously been an open investigation," meaning that the office "periodically receives information which [they] evaluate, and where warranted, investigate."

In early January 1995, Gonterman was instructed to interview Gutierrez "regarding the possible existence of a videotape of [appellant] molesting a minor child." On January 5, 1995, Gonterman had a telephone conversation with reporter Kevin Smith in which Smith asked him (Gonterman) whether he was investigating the existence of the alleged videotape. Gonterman told Smith he was intending to conduct some further interviews and asked Smith if he had any knowledge of such a videotape. Also on January 5, 1995, Gonterman interviewed Gutierrez concerning his knowledge and "[s]hortly thereafter . . . discontinued any further efforts in the matter."

Sneddon handled the investigation of allegations against appellant on behalf of the Santa Barbara District Attorney's Office. In December of 1994, he "received information that a video tape existed depicting [appellant] engaged in sexual contact with a minor child." According to the reports received by Sneddon, Gutierrez had seen the videotape. At around the same time, Dimond contacted Sneddon to inquire about reports that his office was looking for such videotape or investigating new allegations of molestation against appellant. Sneddon informed her that he "was not at liberty to comment upon such reports" but stated that the investigation was "still open . . . ." Although Sneddon did not discuss this with Dimond, at the time of their conversation, a decision had already been made to send Gonterman to look into the existence of the tape and procure it if possible. Gonterman's investigation led to the conclusion that no such videotape could be located or proven to exist. According to Sneddon's "recollection and belief" this conclusion was reached sometime after the *Hard Copy* broadcast on January 9.

To demonstrate lack of malice, respondents first set forth facts showing Dimond's lengthy experience as a reporter. According to Dimond, in late 1994, she heard from fellow journalist Brian Anderson that a new and

significant story about appellant was developing.[5] At around that same time, Dimond was contacted by Gutierrez concerning the possible existence of the incriminating videotape. Thereafter, she contacted Sneddon and his refusal to confirm or deny that his office was attempting to locate such videotape led her to believe that to mean she was on the right track since, according to her understanding and experience, he would have given an outright denial had there been no truth to the story. She subsequently talked to Kevin Smith, who related that he had been interviewed by Gonterman in connection with the videotape and had been told that Gonterman intended to conduct additional interviews. On January 7, 1995, the London Sun, a British newspaper, which reported that " 'Los Angeles police and legal officials were in a frantic race' " to obtain the alleged videotape, was brought to Dimond's attention.[6] After being informed of that article, Dimond again spoke to Gutierrez, who claimed to have seen the videotape and agreed to do an on-camera interview.

Gutierrez had provided early and accurate information on a number of stories pertaining to appellant, such as his marriage to and divorce from Lisa Marie Presley. During the on-camera interview, which occurred on January 8, Gutierrez related that he had met with the mother of the boy involved; that she had attempted to contact the Los Angeles Police Department and was not taken seriously; that she was told to take the tape to any police station; that the tape was "very graphic"; that the district attorney's office had been in contact with the mother; that appellant's "people" were trying to find the tape; that the tape was recorded three weeks before Christmas; and that the tape was in black and white.

All this led to undisputed fact No. 38, the key fact on lack of malice: "Based on Mr. Gutierrez's long track record as a reliable source, coupled with the other reports Ms. Dimond received from Mr. Anderson, Mr. Sneddon and Mr. Smith, *inter alia*, Ms. Dimond believed Mr. Gutierrez's information to be accurate."

Respondents in their statement of undisputed facts went on to relate that Doran's involvement in the story was limited to the on-camera interview of Kevin Smith, who was not named as a defendant and who made no statements alleged in the complaint to be false. Doran was not involved in the factual investigation, editing, or decision to broadcast the story.

---

[5] In a declaration submitted by appellant, Anderson conceded having this conversation with Dimond but explained he was referring to a completely different matter.

[6] The Sun also reported that Gonterman said, " 'I am satisfied the tape exists.' " Gonterman denied ever saying that he was satisfied that the tape existed. A competing London newspaper, the Daily Mirror, reported that the Sun's story was inaccurate. This was also brought to Dimond's attention. Apparently, the late edition of the Sun did not contain the story, but there is no indication that Dimond or anyone else connected to *Hard Copy* was aware of that fact.

*Appellant's Opposition*

The one significant area of dispute between the parties centered on fact No. 38 concerning Dimond's belief in Gutierrez's accuracy. In this regard, appellant's position was supported by the testimony of Brian Anderson's wife, Lisa Marlowe. According to her testimony, sometime during the weekend of January 7 and 8, 1995, Dimond called Anderson from whom she had first heard rumors about a new development concerning appellant. Anderson was not home, so Dimond spoke with Marlowe. Dimond asked Marlowe whether she or her husband had heard the story about a video depicting appellant with a young boy. Marlowe replied she had not and stated, " 'That sounds like B.S.,' " to which Dimond responded, " 'That's what I thought.' " Marlowe also said, " 'Don't tell me this came from Victor [Gutierrez], because he never mentioned it to us' " and " 'This sounds like a setup,' because why would this surface all of a sudden" to which Dimond's reply was " 'Yeah, that's what I thought.' "

Otherwise, appellant did not dispute the facts set forth by respondents, although he contended that respondents were exaggerating or overstating the evidence in certain areas.[7] Appellant relied on additional facts set forth in his counterstatement to establish the viability of his claims. As an initial matter, the counterstatement sets forth as an additional undisputed fact that no incriminating tape existed, pointing to appellant's deposition testimony in which he stated that he has no knowledge of any such tape. In addition, according to the testimony of the woman Gutierrez allegedly identified as the victim's mother,[8] her sons were not molested by appellant, she has never received any payment from appellant, and she has never met Gutierrez. Appellant also established the lack of any record of Gutierrez at the hotel where he claims to have met the mother and viewed the tape.

Appellant's opposition was further supported by the declaration of Lauren Weis, head deputy of the Torrance Branch of the Los Angeles District Attorney's Office, and Gonterman's deposition testimony. Weis learned that Gutierrez was claiming to have seen a videotape of appellant engaged in sexual conduct with a young boy, and informed Sneddon. They jointly decided to instruct Gonterman to interview Gutierrez. Weis also asked Gonterman to speak to Kevin Smith, who had called and left a message asking about the videotape. During that interview, Smith told Gonterman he

---

[7]For example, respondents' statement of facts refers to *reports* received by the office and Dimond that an incriminating videotape existed. Appellant believes that there was only a single *report* which came from Gutierrez.

[8]According to Gonterman, Gutierrez identified Jermaine Jackson's ex-wife as the mother of the victim. Gutierrez denied telling Gonterman this.

had heard that Weis believed he had the tape which Gonterman told him was not true. Smith also told Gonterman that the tape was 27 minutes long and was recorded in black and white. After Gonterman spoke to Gutierrez and Smith, which interviews lasted a total of approximately one hour, nothing more was done to search for a videotape.

The counterstatement of facts sets out a number of actions Dimond could have taken, but did not take, to check out the story, such as asking Gutierrez the name of the hotel where he allegedly saw the tape or the name of the mother whose son was supposedly involved; insisting that Gutierrez produce a copy of the tape; talking to Gonterman about his investigative efforts; obtaining another source for the story; or contacting someone at the Sun about their videotape story.

Concerning Doran, the counterstatement sets forth the following facts to establish his culpability: that he failed to ask Smith the names of his sources, that, according to his testimony, he "did not care who Smith's sources were," that he "didn't particularly care" whether the videotape existed, that his job was simply to "get a good sound bite," and that he "entertained the possibility that the videotape never existed, but he never shared this with Dimond" or others connected to the program.

*The Trial Court's Order*

The trial court granted respondents' motion for summary judgment as to both the first and second causes of action. The court's order stated in pertinent part: "To give rise to liability for defamation, a statement must consist of false assertions of fact regarding the plaintiff. [Citations.] The issue of whether a statement concerns an actionable assertion of fact is a question of law for the court, properly resolved at the summary judgment stage. [Citations.] [¶] The undisputed evidence before the Court shows that the statements at issue truthfully and accurately reported on a developing story about the possible existence of a video tape, and it was stated [in the broadcast] that it was impossible to independently confirm the existence of the videotape. . . . [¶] Furthermore, . . . the broadcasts at issue contained primarily descriptive language or production effects reflecting the Paramount Defendants' interpretation of undisputed investigative activity. Such elements of the broadcast cannot give rise to liability; '[t]he First Amendment requires that the courts allow latitude for interpretation.' *Partington* v. *Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1994). [¶] As such, the Court finds that the Paramount Defendants' reports regarding the videotape do not contain false statements of fact, and therefore no liability is established under *Milkovick* v. *Lorain Journal Co.*, 497 U.S. 1 [110 S.Ct. 2695, 111 L.Ed.2d 1] (1990)."

Concerning Dimond's statement that she was " 'as sure as [she] possibly [could] be of the videotape's existence,' " the court stated that that was "clearly her personal opinion" and not a false statement of fact.

Turning to the issue of malice, the trial court ruled: "Alternatively, even if Paramount Defendants' statements regarding the videotape could be construed as false assertions of fact, the Court finds that Plaintiff has not shown the ability to prove actual malice by clear and convincing evidence. '[T]he burden lies on the plaintiff opposing the motion to affirmatively establish by clear and convincing evidence that a genuine issue of fact exists as to whether actual malice can be proven at trial.' *Aisenson* v. *American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 154 [269 Cal.Rptr. 379]."

Concerning Dimond's conversation with Lisa Marlowe, the court found that it "does not rise to the level of clear and convincing evidence of serious doubt. Marlowe did not explain any factual basis for her belief or that she even informed Dimond as to the reasons for her belief. Moreover, the alleged conversation occurred before Dimond interviewed Gutierrez and obtained the information which enabled her to reach a final determination regarding his account of the videotape." In the face of "undisputed evidence . . . that Gutierrez had been a reliable source of information for Dimond in the past," and case law which "establishe[d] that the broadcast of all or part of a news story on the basis of information provided by a single reliable source precludes a finding of actual malice," the court concluded that "[appellant's] isolated piece of ambiguous evidence does not establish by clear and convincing evidence that a genuine issue of fact exists as to whether actual malice can be proven at trial." This appeal followed the judgment entered on the court's order.

DISCUSSION

I

■ The tort of defamation exists whenever a false and unprivileged statement which has a natural tendency to injure or which causes special damage is communicated to one or more persons who understand its defamatory meaning and its application to the injured party. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 471, p. 558; *id.*, § 476, pp. 560-561.) Moreover, when a party repeats a slanderous charge, he is equally guilty of defamation, even though he states the source of the charge and indicates that he is merely repeating a rumor. (*Id.*, § 478, p. 562.) "If A says B is a thief,

and C publishes the statement that A said B was a thief, in a certain sense this would be the truth, but not in the sense that the law means. ... . [I]t would be but a repetition by [C] of a slanderous charge. His defense must consist in showing that in fact B is a thief." (*Gilman* v. *McClatchy* (1896) 111 Cal. 606, 612 [44 P. 241]; see also *Ray* v. *Citizen-News Co.* (1936) 14 Cal.App.2d 6, 8-9 [57 P.2d 527] ["A false statement is not less libelous because it is the repetition of rumor or gossip or of statements or allegations that others have made concerning the matter."]; *Arditto* v. Putnam (1963) 214 Cal.App.2d 633, 639, fn. 2 [29 Cal.Rptr. 700].)

Since republication of statements made by A about B is a journalist's stock in trade, this rule could lead to a climate of self-censorship in which media organizations hesitate to publish any negative information about a public figure, no matter how well founded, for fear of becoming involved in protracted legal proceedings. Concern about the possible impediment to freedom of the press to criticize public officials formed the backdrop for the United States Supreme Court's 1964 landmark decision in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412] placing First Amendment limits on state defamation law. ■ There, the court held that a "public official" is prohibited "from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (376 U.S. at pp. 279-280 [84 S.Ct. at p. 726].)

Later cases expanded the protection afforded by *New York Times Co.* v. *Sullivan*. In *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [87 S.Ct. 1975, 18 L.Ed.2d 1094], the court determined that the *New York Times* test should apply to criticism of "public figures" as well as "public officials."[9] (388 U.S. at p. 155 [87 S.Ct. at p. 1991].) The court further held that the showing of malice must be made by clear and convincing evidence. (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 342 [94 S.Ct. 2997, 3008, 41 L.Ed.2d 789].) ■ Later, in *Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 777 [106 S.Ct. 1558, 1564, 89 L.Ed.2d 783], the court held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." The court recognized "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." (*Id.* at p. 776 [106 S.Ct. at p. 1563].)

---

[9]Appellant does not dispute that he is a "public figure."

 Even before these Supreme Court pronouncements, however, a "fair comment" defense or privilege[10] had been incorporated into common law as an affirmative defense to an action for defamation. The principle " 'afford[ed] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.' " (1 Harper & James, Law of Torts (1956) § 5.28, p. 456, fn. omitted.) In other words, under common law a statement could not be the basis for liability when it concerned a matter of public concern, was based upon true or privileged facts, represented the actual opinion of the speaker, and was not made solely for the purpose of causing harm. (See *Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1, 13-14 [110 S.Ct. 2695, 2702-2703, 111 L.Ed.2d 1]; Rest., Torts, § 606.) The defense did not extend to a "false statement of fact" which could be "implied from an expression of opinion." (Rest.2d Torts, § 566, com. a, p. 171.)

In *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, a case which involved defamation of nonpublic persons, the Supreme Court made a statement in dicta which seemed to expand the protection afforded to expressions of opinion: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." (418 U.S. at pp. 339-340 [94 S.Ct. at p. 3007], fn. omitted.)

Our Supreme Court cited this dictum in *Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254 [228 Cal.Rptr. 206, 721 P.2d 87], in which a scathing review of a television program on sex education became the subject of a defamation lawsuit. The review included such comments as " '[the program] does little to advance the subject [of sex education] and a lot to exploit it,' " and " 'My impression is that the executive producer . . . told his writer/producer . . . , "We've got a hot potato here—let's pour on titillating innuendo and as much bare flesh as we can get away with. Viewers will eat it up!" ' " (42 Cal.3d at p. 258.) To determine whether the review contained actionable statements of fact or nonactionable opinion, the court "must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular

---

[10]In *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711 [257 Cal.Rptr. 708, 771 P.2d 406], the court explained that although courts and commentators have often stated that fair comment on matters of public concern is "privileged," that terminology is incorrect. " 'A privileged occasion is one on which the privileged person is entitled to do something which no one who is not within the privilege is entitled to do on that occasion.' . . . In the case of fair comment on matters of public concern, however, *all* persons may comment equally. . . . Thus, it is better practice to refer to fair comment as a right rather than a privilege." (48 Cal.3d at p. 733, fn. 18, citations omitted, original italics.)

construction. [Citation.] ' "That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." ' " (*Id.* at p. 260, quoting *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547 [343 P.2d 36].)

■ According to the Supreme Court, " '[W]hat constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole. Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.' " (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 260, quoting *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].)

■ The court went on to explain that "[f]or these reasons, California courts have developed a 'totality of the circumstances' test to determine whether an alleged defamatory statement is one of fact or of opinion" which the court described as follows: "First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. [Citations.] Where the language of the statement is 'cautiously phrased in terms of apparency,' the statement is less likely to be reasonably understood as a statement of fact rather than opinion. (See, e.g., *Gregory, supra,* 17 Cal.3d at p. 603.) [¶] Next, the context in which the statement was made must be considered. Since '[a] word is not a crystal, transparent and unchanged, [but] is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in' which it is used[,]' the facts surrounding the publication must also be carefully considered. (See *Towne* v. *Eisner* (1918) 245 U.S. 418, 425 [62 L.Ed. 372, 376, 38 S.Ct. 158].)" (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260-261, fn. omitted.)

In short, "[t]his contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. [Citation.]" (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 261.)

Subsequently, the United States Supreme Court made clear in *Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at page 18 [110 S.Ct. at page 2705], that the dicta in *Gertz* should not be read "to create a wholesale defamation

exemption for anything that might be labeled 'opinion.' " In *Milkovich*, the defendant had authored an "opinion" column in a local newspaper stating that the high school wrestling team had avoided probation because the wrestling coach and former superintendent had lied in a review hearing. The court was not persuaded that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment" (497 U.S. at p. 21 [110 S.Ct. at p. 2707]), and refused to recognize "an artificial dichotomy between 'opinion' and fact." (*Id.* at p. 19 [110 S.Ct. at p. 2706].) "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' As Judge Friendly aptly stated: '[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words "I think." ' " (*Id.* at pp. 18-19 [110 S.Ct. at pp. 2705-2706], quoting *Cianci* v. *New Times Publishing Co.* (2d Cir. 1980) 639 F.2d 54, 64.)

## II

With these authorities in mind, we turn to the facts of the case before us. Dimond stated in both the KABC-AM broadcast and the *Hard Copy* interview that investigators within the district attorney's office were looking for a videotape that they believed would show appellant and a young boy engaged in some type of sexual conduct. The uncontroverted evidence established that both the Los Angeles and Santa Barbara district attorney's offices had heard reports of such a tape, were looking for it, and had assigned an investigator, Gonterman, to conduct further interviews of persons who might have had knowledge of it.

Appellant does not dispute this evidence but contends that use of inflammatory language such as "racing," "scrambling," and "hot on the trail," as well as language which suggested that a previously closed investigation had been reopened, pushed an otherwise truthful statement into the realm of slander. The Supreme Court has sanctioned the use of "rhetorical hyperbole," exaggeration, and other colorful language to make a point. (See, e.g., *Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 13-14 [90 S.Ct. 1537, 1541-1542, 26 L.Ed.2d 6]; *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 283-285 [94 S.Ct. 2770, 2780-2782, 41 L.Ed.2d 745].) We are not persuaded

that the colorful language used by the *Hard Copy* reporters changed the essential message or changed a truthful report concerning the district attorney's investigative efforts into a defamatory statement. Nor are we persuaded that Dimond's reference to a "renewed" police investigation in the *Hard Copy* broadcast "conveyed the factual message that the previously closed . . . investigation was now reopened" as appellant argues in his brief. Rather, it truthfully relayed the information that an open but inactive investigation had been revivified in order to investigate the report of new evidence. The truth of this statement is confirmed by the testimony of Gonterman, Weis, and Sneddon that the reports of the videotape momentarily breathed life into a dormant investigation.

As a separate ground for his claim, appellant points out that the statements made in the broadcasts taken as a whole conveyed the impression not just that the district attorney's office was looking for an incriminating videotape, but that such videotape in fact existed. Certainly that was the gist of the KABC-AM broadcast in which Dimond said she was sure as she could possibly be that the tape existed, that one of her best sources had seen the tape, that someone close to appellant had found the tape and given it to the mother of the boy involved, that appellant knew about the existence of the tape, that the tape depicted oral sex, that the mother had attempted to turn the tape over to the police and was rebuffed by their lack of interest, and that copies had been made of the tape.[11] It is true that Dimond was merely parroting what she had heard from "sources" but, as we have seen, under common law, it is no defense to an action for defamation to say that one is merely accurately repeating rumor or a statement made by a third party. (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 478, p. 562.) Thus, the issue presented is whether the First Amendment as interpreted in *New York Times Co.* v. *Sullivan* provides a defense.

### III

As we have seen, the court held in *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, that "constitutional guarantees require[] . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (376 U.S. at pp. 279-280 [84 S.Ct. at p. 726].)

---

[11] Although the later *Hard Copy* broadcast adhered more closely to the story of the district attorney's office's investigation into the possible existence of an incriminating videotape, it, too, contained statements which could have led a reasonable viewer to believe that a position was being taken on the existence of such a videotape, including the statements that the tape was "very graphic," that it was in black and white and 27 minutes long, and that there had been a copy made.

■ Actual malice under *New York Times Co.* v. *Sullivan* "is quite different from the common-law standard of 'malice' generally required under state tort law to support an award of punitive damages. . . . [C]ommon-law malice—frequently expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights—would focus on the defendant's attitude toward the plaintiff[] . . . not toward the truth or falsity of the material published. [Citations.]" (*Cantrell* v. *Forest City Publishing Co.* (1974) 419 U.S. 245, 252 [95 S.Ct. 465, 470, 42 L.Ed.2d 419].) The *New York Times Co.* v. *Sullivan* test "directs attention to the 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.' [Citation.]" (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 257 [208 Cal.Rptr. 137, 690 P.2d 610].) " '[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.' [Citations.]" (*Letter Carriers* v. *Austin, supra,* 418 U.S. at p. 281 [94 S.Ct. at p. 2870].)

In *St. Amant* v. *Thompson* (1968) 390 U.S. 727 [88 S.Ct. 1323, 20 L.Ed.2d 262], the court clarified the meaning of the term "actual malice" for First Amendment purposes. There, defendant, a candidate for political office, had interviewed a member of a local union. The interviewee reported that plaintiff, a deputy sheriff, had conspired with the president of the local union to conceal incriminating documents. The candidate reported this allegation word for word in a televised campaign speech.

Purporting to apply the *New York Times Co.* v. *Sullivan* malice standard, the Louisiana Supreme Court concluded that defendant had broadcast false information about plaintiff "recklessly, though not knowingly." (*St. Amant* v. *Thompson, supra,* 390 U.S. at p. 730 [88 S.Ct. at p. 1325].) "Several reasons were given for this conclusion. [Defendant] had no personal knowledge of [plaintiff's] activities; he relied solely on [the interviewee's] affidavit although the record was silent as to [the interviewee's] reputation for veracity; he failed to verify the information with those in the union office who might have known the facts; he gave no consideration to whether or not the statements defamed [plaintiff] and went ahead heedless of the consequences; and he mistakenly believed he had no responsibility for the broadcast because he was merely quoting [the interviewee's] words." (*Ibid.*)

The Supreme Court held that these factors fell short of proving defendant's "reckless disregard for the accuracy of his statements about [plaintiff]." (*St. Amant* v. *Thompson, supra,* 390 U.S. at p. 730 [88 S.Ct. at p. 1325].) First, the court noted the difficulty of describing the boundaries of the standard: " 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out

through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." (*Id.* at pp. 730-731 [88 S.Ct. at p. 1325].) Turning to prior case law for guidance and further definition, the court noted: "In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison* v. *Louisiana,* 379 U.S. 64 [85 S.Ct. 209, 13 L.Ed.2d 125] (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of . . . probable falsity.' 379 U.S., at 74 [85 S.Ct. at p. 216]. Mr. Justice Harlan's opinion in *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 153 [87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094] (1967), stated that evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (*St. Amant* v. *Thompson, supra,* 390 U.S. at p. 731 [88 S.Ct. at p. 1325].)

The court recognized the possibility "that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." (*St. Amant* v. *Thompson, supra,* 390 U.S. at pp. 731-732 [88 S.Ct. at p. 1326].)

The court warned that the defendant in a defamation action brought by a public official could not "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." (*St.*

*Amant* v. *Thompson, supra,* 390 U.S. at p. 732 [88 S.Ct. at p. 1326].) It would be up to the finder of fact to determine whether the publication was made in good faith. "Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (*Ibid.,* fn. omitted.)

In the present case, Dimond did more than profess her good faith. Not only did she state that she believed Gutierrez to be accurate, she backed up her statement with evidence of his reliability as a source on other stories pertaining to appellant—even some that initially seemed farfetched.[12] In addition, she established a palpable reason to believe the story about the videotape due to the fact that the district attorney's office was searching for a tape such as the one Gutierrez described (as confirmed by Kevin Smith, who had spoken with Gonterman, and the "no comment" reply from Sneddon), and the story describing the videotape which appeared in the London Sun. Moreover, the report did not come out of the blue. Appellant had been the subject of a lengthy criminal investigation by the district attorney's office which was widely reported in the press, and had settled a lawsuit in which allegations of sexual molestation were made.

Against this, appellant puts the statement of Lisa Marlowe that in the weekend before the broadcasts aired, Dimond expressed agreement with Marlowe's doubts about the story.

In *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at page 253, the court made clear that although the standard for granting summary judgment in defamation cases was no different from the standard in all other cases, "courts may give effect to . . . concerns regarding a potential chilling effect [from protracted litigation] by finding no triable issues unless it appears that actual malice may be proved at trial by clear and convincing evidence—i.e., evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that the resulting judgment

---

[12]Appellant points out that Dimond and *Hard Copy* had been careful to obtain physical proof before running prior stories about appellant brought to them by Gutierrez. We fail to see the significance of that fact. A responsible reporter will check out stories related by a new source carefully, whereas someone who has consistently proved accurate before will be taken at his or her word. This has no bearing on whether or not Dimond had come to trust Gutierrez *as a source of information about appellant after a lengthy history of providing accurate information.*

' "does not constitute a forbidden intrusion on the field of free expression[.]" ' " (37 Cal.3d at p. 252, quoting *Bose Corp.* v. *Consumers Union of U.S. Inc.* (1984) 466 U.S. 485, 508 [104 S.Ct. 1949, 1963-1964, 80 L.Ed.2d 502]; accord, *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572] ["[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy, and upon such a motion the trial court must determine whether there is a sufficient showing of malice to warrant submission of that issue to the jury. [Citations.]"].)

The United States Supreme Court has agreed: "[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence. [¶] Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." (*Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242, 254 [106 S.Ct. 2505, 2513, 91 L.Ed.2d 202].)

The trial court correctly applied this test in ruling on the motion for summary judgment as it pertained to the statements concerning the existence of the alleged videotape. Accepting the testimony of Lisa Marlowe as true, the court concluded it was insufficient to establish either knowledge of falsity or reckless disregard of truth or falsity on Dimond's part under the applicable standard of clear and convincing evidence.

We agree with the court's assessment. The *New York Times Co.* v. *Sullivan* standard does not require that the reporter hold a devout belief in the truth of the story being reported, only that he or she refrain from either reporting a story he or she *knows* to be false or acting in reckless disregard of the truth. The statements to Marlowe indicate that Dimond had doubts, not that she "knew" Gutierrez's story to be untrue. A healthy skepticism is a normal part of a reputable journalist's makeup and leads him or her to obtain corroborating evidence to back up a source's story. Dimond did not act recklessly in the face of her doubts, but instead sought out corroborating evidence through her conversations with Smith and Sneddon, each of whom confirmed, in their own way, that they had heard a similar report. The story in the Sun provided further corroboration. It may be that the sources for the information relayed by the district attorney's office, Smith, and the Sun can be traced directly or indirectly to Gutierrez, as appellant now claims, but there is no evidence to suggest that Dimond had any reason to know or suspect this at

the time. The statements attributed to Dimond by Marlowe evidence neither knowledge of falsity nor reckless disregard of the truth.[13]

Appellant cites *Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324 for the proposition that actual malice can be inferred from the defendant's admissions, despite her professed reliance on reliable sources and express denial of actual malice, and used to deny summary judgment. First, it must be noted that *Goldwater* was decided long prior to *Anderson* v. *Liberty Lobby, Inc.*, *supra*, 477 U.S. 242, in which the summary judgment standard was set forth. Moreover, in *Goldwater*, the evidence showed that the defendant reporter had not accurately quoted his sources, but had altered observations and taken them out of context. (414 F.2d at p. 337.) No such accusations have been made against the respondents in this case.

### DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied November 20, 1998.

---

[13]Appellant suggests that respondent Doran should have conducted an independent inquiry before conducting the on-camera interview with Smith. Given Doran's limited role in the process, we believe he was justified in relying on Dimond's investigation.