Filed 8/21/15  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ANTHONY MATTHEW RODRIGUEZ,<br><br>  Defendant and Appellant. | F068072<br><br>(Super. Ct. No. BF142014A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Anthony Matthew Rodriguez was convicted of forcible rape (Pen. Code,[1] § 261, subd. (a)(2); count 1), kidnapping to commit rape (§ 209, subd. (b)(1); count 2), and second degree robbery (§ 212.5, subd. (c); count 3). In connection with count 1, the jury found true the following allegations: (1) he kidnapped the victim and the movement of the victim substantially increased the risk of harm to her over and above the level of risk necessarily inherent in the underlying offense, i.e., rape (§ 667.61, subd. (d)(2)); and (2) he kidnapped the victim to commit rape (§ 667.61, subd. (e)(1)). Defendant was sentenced to 25 years to life on count 1 plus a consecutive five years on count 3. Execution of punishment on count 2 was stayed pursuant to section 654.

On appeal, defendant argues the trial court erred by denying his mistrial and new trial motions; and by imposing separate sentences for the rape and robbery. We reject these contentions and affirm the judgment.

### STATEMENT OF FACTS

**I.     Prosecution case-in-chief.**

On March 16, 2012, sometime after dusk, Jane Doe[2] was walking to her house through Martin Luther King Park in Bakersfield when she was approached by a tan-skinned man who appeared to be either "around high school age" or in his early 20's and wore a hooded jacket, a beanie, and jeans. He threw her facedown to the ground, mounted her, and seized her backpack, which contained her mother's laptop computer. When Jane Doe tried to retrieve the backpack, the man grabbed her shirt and dragged her toward a restroom. At some point, he tore the shirt and punched her in the head. Inside the empty restroom, the man removed Jane Doe's pants and inserted his penis into her

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2]     In this opinion, the victim is identified by the pseudonym "Jane Doe" to protect her privacy. (See § 293.5, subd. (a).) No disrespect is intended.

vagina as she signed the word "no" repeatedly.[3]  A few minutes later, he ejaculated.  The man then left the restroom with the backpack.[4]

Thereafter, Jane Doe went home and reported the incident to her mother, who called 911.  Police officers arrived sometime after 11:52 p.m. and obtained an initial statement via the mother's translation.  The officers spotted bruises on Jane Doe's forehead and neck and scratches on her nose and chest.  In addition, her clothes were dirty.  The officers brought the women to Martin Luther King Park to pinpoint the crime scene.  Jane Doe led the group to the bathroom where she had been raped and the area north of the restroom where she had first encountered her assailant.  The distance between the two sites was 95 feet.  In the vicinity, the officers found a piece of cloth matching Jane Doe's torn shirt.

In the early morning hours of March 17, 2012, with a sign language interpreter present, Jane Doe was interviewed at the Bakersfield Police Department by Detective John Jamison, the lead investigator.  She described her assailant as a "muscular," five-foot-five-inch to five-foot-seven-inch "Hispanic male in his late teens."

Jane Doe underwent a sexual assault examination at Bakersfield Memorial Hospital.  Deborah McDowell, the nurse examiner, observed neck, shoulder, chest, and lower back abrasions as well as arm and lower back erythema, but did not find any genital trauma.[5]  Vaginal swabs were obtained and sent to the Kern Regional Crime Laboratory.

---

[3]    Jane Doe is "profoundly deaf" and communicates via sign language.  At trial, she was aided by a team of interpreters.

[4]    On cross-examination, Jane Doe denied going to the park on the night in question to "find little boys," engaging in consensual sex with defendant "because he was a child," and subsequently being robbed by someone else.  She further denied fabricating the rape due to fear "of what [her mother] was going to do because [she] had been at th[e] park and lost th[e] computer."  (See fn. 8, *post*.)

[5]    McDowell testified that absence of genital trauma does not necessarily rule out nonconsensual intercourse:

A composite sketch of Jane Doe's assailant was released to the public on March 18, 2012. The following day, Jamison received a phone call from a woman who believed the image depicted Mike Zarate-Jacobo, an ex-boyfriend. On March 20, 2012, Jane Doe looked at a six-pack photo lineup and selected Zarate-Jacobo's picture. He was arrested on March 22, 2012.

Preliminary testing of Jane Doe's vaginal swabs on April 6, 2012, verified the presence of semen. A DNA profile was taken from the spermatozoa. Another DNA profile was taken from Zarate-Jacobo's cheek cells. These profiles did not reveal any matching alleles. As a result, Zarate-Jacobo was released from custody.

The DNA profile taken from the spermatozoa was uploaded to the Combined DNA Index System (CODIS). On May 2, 2012, the database identified defendant as a candidate.[6]

On May 3, 2012, Jane Doe viewed a six-pack photo lineup which contained defendant's picture. She did not select anyone, writing "she c[ould ]not remember [the] face."[7]

On May 4, 2012, defendant was arrested. A DNA profile, taken from his cheek cells, confirmed he was the contributor of the spermatozoa. Dr. Ruth Dickover, a criminalist in the Kern Regional Crime Laboratory's DNA Analysis Unit, testified that

---

"Literature supports that in the majority of the cases in sexual assault anywhere from 40 to 80 percent of the victims will not be found with injury to the genitalia area. [¶] And even to further explain, that area on a female is meant to expand. It's meant to deliver a baby. So the tissues in that area, for the most part, stretch to accommodate. [¶] … [¶] … In over a hundred sexual assault exams,] I would probably say—how many times I've had findings, maybe [10] to 15 percent."

[6] Defendant furnished a DNA sample in connection with an earlier juvenile adjudication.

[7] At trial, Jane Doe identified defendant as her assailant, indicating she was able to do so because "the light [was now] clearly on his face …."

the likelihood of the spermatozoa belonging to another person of Hispanic descent was one in 910 quadrillion, i.e., 910,000,000,000,000,000.

## II. Defense case-in-chief.

On March 22, 2012, Detective Jeremy Blakemore searched Zarate-Jacobo's residence and retrieved a jacket, beanies, women's jewelry, and identification cards belonging to another man.

## DISCUSSION

## I. The trial court did not abuse its discretion when it denied defendant's mistrial and new trial motions.

a. *Background.*

The prosecutor filed a motion in limine to exclude evidence of Jane Doe identifying Zarate-Jacobo as her assailant. Defense counsel opposed the motion, claiming the misidentification "represent[ed] evidence of a motive on [Jane Doe's] part to fabricate evidence."[8] The court denied the motion.

On direct examination, Jamison testified about Zarate-Jacobo's exoneration:

"Q. All right. Now, when Mr. Jacobo was arrested—we've heard some testimony about a buccal swab being taken from [defendant]. Did you have a buccal swab taken from Mike Jacobo?

"A. Yes, I did, pursuant to a search warrant.

"Q. All right. Subsequent to March 22nd when you arrested Mr. Jacobo—and he was in custody, correct? He didn't make bail.

"A. That's correct. He remained in custody.

"Q. All right. Did you receive some information that caused you to wonder if you had the right person?

"A. Absolutely.

---

[8] In his summation, defense counsel outlined the following theory: Jane Doe engaged in consensual sexual intercourse with defendant, was subsequently robbed by Zarate-Jacobo, and deliberately lied about what actually transpired.

"Q. To put it bluntly.

"A. It did.

"Q. And can you tell us about that, please?

"A. You met Detective [Keli] Reed, who was here previously.[9] We worked in the same detail together. On April 1st she was assigned a rape case, as well, that occurred in the same general vicinity. The descriptions were similar. At that point we were fearful that we might have a serial rapist in that area of town, so I asked the District Attorney's Office to expedite the DNA testing to either confirm or eliminate Mr. Jacobo."

Defense counsel immediately requested a sidebar. Outside the jury's presence, the court, the attorneys, and Jamison discussed the preceding testimony:

"[DEFENSE COUNSEL]: … [¶] Your Honor, first of all, the information that … the detective has told the jury, that there was another rape in April of 2012, the same area, and that he was afraid that there was—

"THE COURT: I didn't hear him say that. Is that what you said?

"[JAMISON]: I testified to Detective Reed's investigation, your Honor.

"THE COURT: Where was that rape?

"[JAMISON]: It was in the same area.

"THE COURT: In the park?

"[JAMISON]: I believe … 901 East California was what the report says.… [I]t was on Martin Luther King Junior Boulevard.

"THE COURT: Martin Luther King Boulevard. Where is that in reference to the park?

"[JAMISON]: It's within a block or two to the east.

"THE COURT: East of it.

"[PROSECUTOR]: Can I just add? [¶] Wasn't it a woman in a cab, a cab driver?

---

**9** Reed was a witness for the prosecution.

"[JAMISON]: Yes, it was.

"[PROSECUTOR]: Wasn't she raped in her cab?

"[JAMISON]: Yes.

"[PROSECUTOR]: I wasn't going to ask those questions, but I think it's important that the Court understands that.

"THE COURT: It helps me get some context. Go ahead, sir.

"[DEFENSE COUNSEL]: That information being told to the jury leaves the impression that the reason that they had to do the DNA was because there was a serial rapist. He already said that, rapist, and that my client could have been possibly that person; that the DNA cleared that innocent man, Jacobo, and then pointed to the real rapist, … who was outside and had the ability to become … that rapist. [¶] … [¶]

"This is an issue for mistrial. The jury has been now left with the impression that my client is a person that is a serial rapist; that he raped that woman on March 16 and another one in April. That is enough for me to be entitled to get the information, because now I need to attack that thing and I don't have the police report. [¶] … [¶]

"THE COURT: Let me ask you this: Was that rape with the cab driver ever resolved?

"[JAMISON]: No, sir.

"[DEFENSE COUNSEL]: It's still pending, your Honor.

"THE COURT: Is [defendant] a suspect?

"[JAMISON]: Not that I'm aware of, no. [¶] … [¶]

"[PROSECUTOR]: First of all, I would never leave it out there in court that [defendant] was a suspect in another case. The DNA work on the cabbie case has been done and [defendant] was eliminated as a suspect. He is not a suspect in that case.

"So had I finished my direct examination, the direct examination would have gone on—the only reason I was bringing that up is because that's why he asked that the DNA be expedited and that's why … [at] the end of April Mr. Jacobo was eliminated as a suspect.

7.

"I want the record to reflect clearly that I made a motion to keep out any of this. The Court ruled against me, respectfully—

"THE COURT: You did, and [defense counsel] opposed your motion.

"[PROSECUTOR]: Yes. And I said in my moving papers if this comes in, it is going to be an undue consumption of time issue because … I'm now going to have to basically deal with the victim … picking the wrong person out of a lineup … [and] spend a bit of time to show that the members of the Bakersfield Police Department aren't—I apologize— complete idiots. I have to basically be able to show that there's a reason they did what they did and why they arrested Mr. Jacobo. That all becomes relevant. [Defense counsel] can attack the victim, [he] can attack the investigation, and that's really what he's been doing. He's had a very multi-pronged attack. [¶] … [¶]

"… [O]n the area of whether this prejudices the defendant, how could it possibly prejudice him? Detective Jamison is going to say that they ran the DNA and it excluded Mike Jacobo as a suspect and that it hit on [defendant]. That's what it's going to show, and that's what all the remaining witnesses are going to come and testify to. [¶] And further—

"THE COURT: As to our case.

"[PROSECUTOR]: Yes. [¶] And further, that—

"THE COURT: Did it exclude [defendant]?

"[PROSECUTOR]: Yes. And I'll bring that out. I'm not trying to link him as a serial rapist. In fact, right now there is no serial rapist.

"THE COURT: Here's the question. When you use the term 'serial rapist,' I immediately think of multiple rapes. From what I've heard so far, the only other alleged rape besides this case is what happened in the cab. And from what you're telling me, it was a cab operator, female, raped in her cab.

"[PROSECUTOR]: Yes. [¶] … [¶]

"THE COURT: And that DNA testing has excluded Mr. Jacobo and the accused in our case.

"[PROSECUTOR]: Yes. And—

8.

"THE COURT:  Were there any other rapes in that area?

"[PROSECUTOR]:  No, not that I'm aware of.

"[JAMISON]:  Not that I'm aware of.  [¶] … [¶]

"[PROSECUTOR]:  One more point.  [¶]  The point is … that's why Detective Jamison testified in this fashion.  Mr. Jacobo couldn't have done that cab rape because he was in custody.  That's what got Detective Jamison thinking that oh, my gosh, do we have a serial rapist?  If we do, it couldn't be Jacobo because he's in custody.  And that's why the DNA was done quickly, because we obviously don't want an innocent man sitting in jail, and that was Mr. Jacobo.

"THE COURT:  And so you're saying if permitted you would have brought all of this out this afternoon.

"[PROSECUTOR]:  Well, yes, I was doing that.  That's where my questioning was going.

"THE COURT:  I, quite frankly, with that explanation, can't see how it prejudices your client, sir.

"[DEFENSE COUNSEL]:  Your Honor, let me explain my logic.  [¶] … [¶] … [I]f the detective was going to say listen, we went in and we asked for expedited DNA analysis on this case, not a problem.  They have the DNA.  It points to my client as the person who had sex with that woman.  Not a problem.

"But what he did was he went in and dropped a little hand grenade in the middle of the courtroom, directed to my client exclusively, by now saying look, 14 people on the jury, this man is most likely a serial rapist, although we haven't yet been able to identify him, really, but it is very likely that this man is because he was out there in April when we had Jacobo in jail.

"If that is not prejudicial, if that has not irreparably tainted that jury against my client, I have no idea what else could be except to have the Pope come in and testify that my client is a rapist.  [¶] … [¶]

"THE COURT:  I don't think we need Pope Francis to defuse your argument based upon the fact that DNA has excluded not only Mr. Jacobo, but [defendant], and that there was only one other alleged rape, and that other alleged rape has DNA that excludes both those gentlemen.  [¶] … [¶] … Unless I'm missing something.  [¶] … [¶]

9.

"[DEFENSE COUNSEL]: The element that the Court is missing is that it has been planted in this jury that my client not only is the person who has been pointed as the rapist of Ms. Jane Doe, but also possibly a person that was involved in the rape of another woman in the same area, same general location, as Martin Luther King Park.

"THE COURT: Let's find out first. [¶] What was the date of that other rape?

"[DEFENSE COUNSEL]: April.

"[JAMISON]: April 1st, your Honor.

"THE COURT: Was [defendant] ever a suspect?

"[JAMISON]: No. [¶] … [¶]

"THE COURT: … [W]hy was he never a suspect?

"[JAMISON]: Nothing ever led us to look at [defendant] as a suspect in that case.

"[PROSECUTOR]: Remember they weren't working him as a suspect in this case—

"THE COURT: Right.

"[PROSECUTOR]: —until it was a CODIS hit…. [¶] … [¶]

"THE COURT: I, quite frankly, do not see the linkage, and … I'll give counsel some leeway to proceed with her examination. [¶] … [¶]

"[DEFENSE COUNSEL:] But what they're doing right now—and I'm not saying it's intentional. It doesn't matter if it's intentional. It has polluted, poisoned my well. I'm asking [the jury] to believe that my client is not guilty. That's essentially what I'm doing here.

"THE COURT: I understand.

"[DEFENSE COUNSEL]: And they were just told that he may have been implicated in serial rapist activity in that region of the city.

"THE COURT: I don't interpret it that way as long as … the People offer a stipulation that at no time was [defendant] ever … considered to be a suspect—

10.

"[DEFENSE COUNSEL]: Yes.

"THE COURT: —I think that cures it, as long as the explanation is given by the People and by the investigating detective …. [¶] … [¶]

"THE COURT: I indicated I wanted to hear the examination by [the prosecutor] of [Jamison] ….

"I anticipate—although I'm not sure, but based on what [the prosecutor] put on the record here …—there's going to be some indication that [defendant] never was and never is, never has been, a suspect in any form of serial raping; that there was not multiple rapes. There was this one alleged, for which [defendant] is now a suspect. He was not originally. The only way he was brought into the case was by an alleged match of DNA. And that he never was a suspect in this singular other rape, for which both he … and the original suspect, Mr. Jacobo, have been excluded by way of DNA testing.

"Is there any other element of that that I left out …?

"[PROSECUTOR]: I don't believe so, your Honor."

The prosecutor's direct examination of Jamison continued over defense counsel's continuing objection:

"Q.    Detective Jamison, when we left off you had indicated that you had requested that the DNA work on this case involving Mr. Jacobo, involving Jane Doe, that it be expedited, correct?

"A.    Yes, ma'am.

"Q.    And the laboratory that does DNA testing for law enforcement is the Kern Regional Crime Lab here in Bakersfield?

"A.    Yes, ma'am.

"Q.    And did you receive … information from the crime lab that indicated that Mr. Jacobo was excluded as a contributor to the semen that was found in Jane Doe's rape kit?

"A.    Correct. [¶] … [¶] … Mr. Jacobo was eliminated as a suspect. [¶] … [¶]

"Q.    In Jane Doe's case.

11.

"A.   In Miss Jane Doe's case, yes.  [¶] … [¶]

"Q.   You used the phrase that you had concerns that there was a serial rapist, and Detective Reed said her case occurred on April 1st.

"A.   Correct.  [¶] … [¶]  … We had two rapes within approximately two weeks.  That's what I based my decision on.  [¶] … [¶]

"Q.   Serial rapist is someone who commits more than one rape.

"A.   More than one rape.

"Q.   So Mr. Jacobo was excluded as basically a suspect in Jane Doe's case, correct?

"A.   Yes, ma'am.

"Q.   And he was excluded also, with DNA testing, in Detective Reed's case, correct?

"A.   Correct.  [¶] … [¶]

"Q.   Were you informed that there had been a … hit in the [CODIS] to [defendant] …?  [¶] … [¶]

"A.   Yes.  [¶] … [¶]

"Q.   Now, you had indicated that there was concern that there was a serial rapist.  In terms of the suspect in Detective Reed's case, [defendant] was never a suspect in that case, was he?

"A.   No.  He was eliminated.

"Q.   And, in fact, when DNA testing was run, he was eliminated as a suspect in that case.

"A.   Yes.  That's correct.  That's what I meant.

"Q.   Detective Reed's case.

"A.   Yes, ma'am."

Before defense counsel cross-examined Jamison, the court advised the jury:

"It is stipulated between the parties that [defendant] … is not and never was a suspect in any rapes other than the case in which he is currently being prosecuted."

12.

Additionally, prior to jury deliberations, the court gave the following instructions:

> "[CALCRIM No. 222:] During the trial, you were told that the People and the defense agreed or stipulated to certain facts. This means that they both accept those facts as true. Because there is no dispute about those facts, you must also accept them as true. [¶] … [¶]

> "[CALCRIM No. 303:] During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. [¶] … [¶]

> "[Special Instruction No. 1:] The reference to a serial rapist by Detective Jamison during his testimony is to be considered … only for the purpose of explaining Detective Jamison's reason for expediting the DNA process. Detective Jamison's comments regarding a serial rapist was not a reference to the defendant …."

On September 13, 2013, nearly a month after the jury announced its verdict, defense counsel moved for a new trial. He argued, inter alia, that Jamison's "serial rapist" comment was unduly prejudicial. The prosecutor opposed the motion, arguing the stipulation and jury instructions remedied any possible prejudice. The court denied the motion.

b. *Standard of review.*

An appellate court reviews a trial court's rulings on a motion for a mistrial and a motion for a new trial under the deferential abuse-of-discretion standard. (*People v. Gonzales* (2011) 51 Cal.4th 894, 921; *People v. Thompson* (2010) 49 Cal.4th 79, 140.) "'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

c. *Analysis.*

A mistrial, which "terminat[es] the trial prior to resolution by the jury" (*People v. Batts* (2003) 30 Cal.4th 660, 679), "should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction" (*People v. Haskett* (1982) 30 Cal.3d

13.

841, 854). "Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis." (*People v. Chatman* (2006) 38 Cal.4th 344, 369-370; see, e.g., *People v. Collins* (2010) 49 Cal.4th 175, 196-199 [the trial court did not erroneously deny a mistrial motion when it concluded that any prejudice resulting from a witness's brief and ambiguous remarks about the defendant's prior incarceration could be cured by a limiting instruction].)

"A new trial is a reexamination of the issue in the same [c]ourt, before another jury, after a verdict has been given." (§ 1179.) "The granting of a new trial places the parties in the same position as if no trial had been had" (§ 1180), thus "ha[ving] the same effect as a mistrial" (*Veitch v. Superior Court* (1979) 89 Cal.App.3d 722, 727). A new trial is proper "when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial … before a jury …." (§ 1181, subd. 5; cf. *People v. Williams* (1997) 16 Cal.4th 153, 211 ["'Although most cases involve prosecutorial or juror misconduct as the basis for [a mistrial] motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice.'"].) "Each case of misconduct must be judged by its own particular circumstances, and before a judgment is reversed on that ground it must appear that the misconduct reached the point where injustice resulted to the defendant." (*People v. Granillo* (1934) 140 Cal.App. 707, 717.) "[I]t is a general rule that misconduct … will not suffice to justify the granting of a new trial if upon the whole case it can be said that the possible effect thereof was subsequently removed by a proper admonition of the trial court to the jury, having in mind the presumption that the jury obeyed the court's instruction." (*Ibid.*)

We conclude the court did not abuse its discretion when it denied defendant's mistrial and new trial motions. In response to the prosecutor's inquiry into information casting doubt on Zarate-Jacobo's culpability, Jamison referred to a second rape in the vicinity of Martin Luther King Park occurring after Jane Doe's rape and Zarate-Jacobo's arrest. He then specified he was afraid a "serial rapist" was on the loose and

14.

recommended prompt DNA analysis to establish whether Zarate-Jacobo was Jane Doe's assailant. Jamison later clarified on direct examination that the testing not only absolved Zarate-Jacobo as a suspect in both rapes, but also absolved defendant as a suspect in the second rape. Assuming arguendo Jamison's sporadic utterances of "serial rapist" were meant to portray defendant as such, any prejudice was cured. The court issued Special Instruction No. 1, which emphasized Jamison's remark "was not a reference to the defendant," and prohibited the jury from considering the remark for anything other than "explaining Detective Jamison's reason for expediting the DNA process." It also issued CALCRIM No. 303, which cautioned the jury that certain evidence "admitted for a limited purpose" can be considered "only for that purpose and for no other." (See *People v. Williams* (2013) 58 Cal.4th 197, 271 ["[W]e presume that the jurors followed the trial court's instructions."].) Moreover, the court informed the jurors of the stipulation that defendant "is not and never was a suspect in any rapes other than the case in which he is currently being prosecuted" and instructed them by way of CALCRIM No. 222 to accept the stipulation "as true." (See *Palmer v. City of Long Beach* (1948) 33 Cal.2d 134, 141-142 ["[A stipulation] is conclusive upon the parties, and the truth of the facts contained therein cannot be contradicted."]; accord, *People v. Griggs* (2003) 110 Cal.App.4th 1137, 1141.) Though defendant asserts in his opening brief that neither the instructions nor the stipulation remedied the alleged harm, he "offers no reason to think these sharply worded warnings did not 'counteract fully whatever prejudice to [him] resulted from [Jamison's] remarks.'" (*People v. Burgener* (2003) 29 Cal.4th 833, 876, quoting *People v. Bolton* (1979) 23 Cal.3d 208, 216, fn. 5.)

## II.     The court properly imposed separate sentences for the rape and robbery.

### a.  *Standard of review.*

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making

this determination.  Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; see *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271 ["We review the court's determination … for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence."].)

b.  *Analysis.*

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)  "The prohibition in section 654 against multiple punishment applies not only where one act in the ordinary sense is involved but also where there is a course of conduct that violates more than one statute and comprises an indivisible transaction."  (*In re Cruz* (1966) 64 Cal.2d 178, 180.)

"It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible."  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once."  (*Ibid.*)  "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'  [Citation.]"  (*Ibid.*)

As a threshold matter, defendant maintains he cannot be punished for both forcible rape with the aggravated kidnapping enhancement (count 1) and second degree robbery (count 3) because these offenses "had but a single objective, which was to assault … and exert dominance over [Jane Doe]," and were thus "part of one, indivisible transaction."

16.

We disagree. Defendant's purported sole objective, i.e., to assault and exert dominance, is too broad (see, e.g., *People v. Ratcliffe* (1981) 124 Cal.App.3d 808, 819 ["to humiliate the victim"]; *ibid.* ["to gain revenge"]) and "[can]not cause a course of conduct to be deemed an indivisible transaction" (*ibid.*). (See *People v. Coelho* (2001) 89 Cal.App.4th 861, 887 ["Even though each act may share such a general motivation, courts [can] conclude that multiple punishment is proper."].)

We find particularly instructive *People v. Alvarado* (2001) 87 Cal.App.4th 178. In that case, the defendant broke into the victim's home, assaulted her, and demanded her money. After she gave him her purse, he pushed her into the bedroom and raped her. (*Id.* at p. 184.) The jury convicted the defendant of residential burglary, residential robbery, false imprisonment, and forcible rape and found he perpetrated the rape during a burglary. (*Ibid.*) The court sentenced him to 15 years to life for rape with the burglary special circumstance and six years for robbery. It stayed execution of punishment for burglary and false imprisonment. (*Ibid.*) On appeal, the defendant claimed the imposition of separate sentences for the rape and robbery violated section 654 because (1) "the burglary, robbery, and rape were part of an indivisible course of criminal conduct"; (2) "the burglary and robbery shared the same intent to steal"; and (3) "the life term for rape during a burglary" and the robbery sentence doubly "punished his intent to steal." (*People v. Alvarado*, *supra*, at p. 196.) The Sixth Appellate District rejected the argument. It reasoned:

> "[T]he rape and robbery each had its own unique objective, and neither was merely incidental to or a means toward committing the other. Defendant robbed the victim for money, and he raped her for sexual gratification; conversely, he did not rape the victim to get money or steal her money to rape her. Thus, although the crimes were part of an otherwise indivisible course of conduct they are separately punishable.… [¶] … [¶]
>
> "Although the robbery sentence punished defendant's intent to steal and precluded separate punishment for the burglary conviction itself because both shared the same intent, the rape during the ongoing burglary

17.

and the robbery did not share that intent and, therefore, did not merge for purposes of punishment. Thus, the trial court properly punished defendant for both crimes. Moreover, we consider multiple punishment clearly appropriate here because defendant's overall conduct after entry was far more culpable because of the rape than it would have been without it." (*People v. Alvarado*, *supra*, 87 Cal.App.4th at pp. 197-199; see *id.* at p. 194 ["Although the robbery and rape were committed within a single period of aberrant behavior, their objectives were predominately independent of each other: the former to obtain money, the latter to obtain sexual gratification."].)

The record—viewed in the light most favorable to the verdict—shows defendant threw Jane Doe facedown to the ground, mounted her, and seized her backpack, manifesting his specific intent to steal. (*People v. Johnson* (1972) 28 Cal.App.3d 653, 657; see § 29.2, subd. (a).) Even though he took possession of his victim's property, he did not abscond, not unlike the culprit in *People v. Alvarado*, *supra*, 87 Cal.App.4th 178. Instead, defendant violently dragged Jane Doe 95 feet to a restroom, removed her pants, and engaged in nonconsensual sexual intercourse with her. Notwithstanding the temporal proximity of these offenses, a trier of fact could reasonably deduce a separate intent and objective for each offense. Defendant did not have to rape Jane Doe to accomplish the robbery. Given the apparent ease by which he initially procured the backpack, he likely could have quelled her attempt to recover the item and left the scene. That defendant opted to drag Jane Doe the length of a professional basketball court to the interior of an empty lavatory and sexually assault her—an exertion of force clearly beyond what would have been necessary to simply subdue her and flee—suggested he pursued an objective distinct from depriving her of her personal property: achieving sexual gratification. Furthermore, absent evidence he used the stolen backpack to lure her into the restroom, it is difficult to imagine the robbery was an essential means toward commission of the rape. Since substantial evidence supported the "implied finding that … defendant harbored a separate intent and objective for each offense" (*People v. Blake* (1998) 68 Cal.App.4th

18.

509, 512), we conclude the court properly imposed punishment on both count 1 and count 3.

## **DISPOSITION**

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
FRANSON, J.